# EXHIBIT G

```
                                                              Page 1
 1            UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF CALIFORNIA
 3
     _____
 4   CARLOS VICTORINO, et al.,     )
                                   )
 5              Plaintiffs,        )
                                   )
 6         vs.                     )No.3:16-cv-01617-GPC-JLB
                                   )
 7   FCA US LLC,                   )
                                   )
 8              Defendant.         )
     _____)
 9
10
11
12
13
14       VIDEO RECORDED DEPOSITION of CARLOS VICTORINO
15                  Los Angeles, California
16                  Friday, April 28, 2017
17                        Volume 1
18
19
20
21   Reported by:
     MARYAM T. SALAHUDDIN
22   CSR No. 9669
23   Job No. 2597639
24
25   PAGES 1 - 204
```

Page 2

1                UNITED STATES DISTRICT COURT
2                SOUTHERN DISTRICT OF CALIFORNIA
3
   _____
4  CARLOS VICTORINO, et al.,        )
                                    )
5            Plaintiffs,            )
                                    )
6      vs.                          )No.3:16-cv-01617-GPC-JLB
                                    )
7  FCA US LLC,                      )
                                    )
8            Defendant.             )
   _____)
9
10
11
12
13
14           Video Recorded Deposition of CARLOS
15  VICTORINO, Volume 1, taken on behalf of Defendant, at
16  1875 Century Park East, Los Angeles, California,
17  beginning at 9:38 a.m. and ending at 4:26 p.m. on
18  Friday, April 28, 2017, before MARYAM T. SALAHUD-DIN,
19  Certified Shorthand Reporter No. 9669.
20
21
22
23
24
25

```
                                                          Page 3
 1   APPEARANCES:
 2
 3   For Plaintiffs:
 4      CAPSTONE LAW APC
 5      BY:   CODY PADGETT
 6      BY:   KAREN WALLACE
 7      Attorneys at Law
 8      1875 Century Park East, Suite 1000
 9      Los Angeles, California 90067
10      310-712-8159
11      Cody.Padgett@capstonelawyers.com
12
13   For Defendant:
14      THOMPSON COBURN LLP
15      BY:   THOMAS L. AZAR
16      Attorney at Law
17      One US Bank Plaza
18      St. Louis, Missouri 63101
19      314-552-6000
20      thompsoncoburn.com
21
22   Videographer:
23      JOHN TOPPING
24
25
```

Page 36

1  Q  You can answer.
2  A  That is why I hired experts.
3  Q  Any other parts or components removed from your
4  vehicle that you are aware of?
5  A  Are we talking about as it relates to this case?
6  Q  Well, for now including relates to this case but
7  also in general.
8  A  Okay.
9  Q  I am just trying to get a list of pieces that
10 were once part of your vehicle that are not a part of
11 your vehicle anymore and have been removed.
12 A  Tires.
13 Q  Tires.  When did you have your tires replaced?
14 A  I would like to say a month or two before getting
15 the clutch repaired.
16 Q  So would that be sometime in 2016 or late 2015?
17 A  I believe it was late 2015.
18 Q  Okay.  Any other parts?
19 A  The lug bolts for the rims.
20 Q  Okay.  Did you keep the old lug bolts?
21 A  No.
22 Q  Any other parts that have been removed from or
23 replaced on the vehicle?
24 A  Not to my recollection.
25 Q  Okay.  You mentioned you had your clutch worked

```
                                                      Page 37
 1   on one time; right?
 2      A   By the dealership.
 3      Q   Okay.  Have you had your clutch worked on other
 4   than by the dealership?
 5      A   No.
 6      Q   Okay.  Did you keep any of the parts that were
 7   removed as relates to the clutch repair on your vehicle?
 8      A   No.
 9             MR. PADGETT:  Vague and ambiguous.
10             Go ahead.
11   BY MR. AZAR:
12      Q   Sorry.  Was the answer no?
13      A   No.
14      Q   So just to make sure I'm clear, other than the
15   air intake, any part that was removed from your vehicle
16   is gone?  You don't have it?
17      A   Correct.
18      Q   Is there any place you still need to look to make
19   sure that is correct?
20      A   No.
21      Q   Mr. Victorino, do you currently own a model year
22   2014 Dodge Dart?
23      A   Yes.
24      Q   Does anyone in your family or anyone else that
25   you know also own or drive a Dodge Dart?
```

Page 96

1  your practice to talk to your cousin, Enrique Victorino?
2             MR. PADGETT:  Vague and ambiguous.
3             THE WITNESS:  Correct.
4  BY MR. AZAR:
5    Q   And did you ever talk to Enrique Victorino about
6  the stalling issue that you were experiencing?
7             MR. PADGETT:  Vague and ambiguous.
8             THE WITNESS:  No, because at the time I
9  didn't think it was an actual mechanical issue.
10 BY MR. AZAR:
11   Q   How long did you go thinking that it was not a
12 mechanical issue?
13   A   Until the vehicle became undrivable.
14   Q   Okay.  And that is around January of 2016?
15   A   I believe so.
16   Q   Is it your belief that the stalling you were
17 experiencing has something to do with the defect you are
18 alleging in this case?
19            MR. PADGETT:  Objection.  Calls for expert
20 opinion.
21            THE WITNESS:  I can't conclusive because I'm
22 not an expert on this.  I can say it is not there after
23 the replacement.  That issue at least.
24 BY MR. AZAR:
25   Q   Have you had any other issues with your vehicle

Page 119

1  A   Probably a girlfriend or, yeah, maybe coworkers
2  or girlfriend.
3  Q   Okay.  Is it one girlfriend or different
4  girlfriends during the same period?
5  A   I'm not that popular.
6          MR. PADGETT:  I was going to say.
7  BY MR. AZAR:
8  Q   And what is the name of your girlfriend?
9  A   Gabriella Ramirez.
10 Q   And as we talked about earlier, you never took
11 your vehicle to a mechanic back to the dealership or to
12 anyone else to have them check out this stalling that is
13 described here in interrogatory response No. 7; correct?
14         MR. PADGETT:  Asked and answered.
15         THE WITNESS:  What was the question again?
16         MR. AZAR:  Would you read back the question.
17         (Record read.)
18         THE WITNESS:  Correct.
19 BY MR. AZAR:
20 Q   All right.  So going down to the next paragraph,
21 this describes an incident in January, 2016 relating to
22 your vehicle; correct?
23 A   Correct.
24 Q   And so it starts, "On or around January 10, 2016
25 plaintiff was driving his vehicle, and he noticed the

Veritext Legal Solutions
800-567-8658                                              973-410-4040

Page 120

1  gears were not properly catching when attempting to
2  shift.  The vehicle was bogging down and failing to
3  accelerate as a result."
4       Do you see that?
5   A   Yes.
6   Q   Where was this?  Do you recall?
7   A   I believe it was after I picked up my girlfriend.
8   Q   Okay.  And where locationwise were you?
9   A   I mainly noticed it entering the freeway.
10  Q   Okay.  Freeway where?  Give me a location.
11 Sorry?
12  A   Okay.  Geographically.  San Diego, California.
13  Q   Okay.  Had you had any problems with the gears
14 not properly catching when you attempted to shift before
15 January 10, 2016?
16          MR. PADGETT:  Vague.  Expert opinion.
17          THE WITNESS:  Not to my knowledge.
18 BY MR. AZAR:
19  Q   You didn't notice any problem with gears not
20 catching until you were in San Diego?
21          MR. PADGETT:  Vague and ambiguous.  Calls
22 for expert opinion.  Asked and answered.
23          THE WITNESS:  Not until that day.
24 BY MR. AZAR:
25  Q   Do you remember what day of the week that was?

Page 125

1  Q  So they told you -- sorry.  Strike that.
2     Did they tell you clutch repairs were not covered
3  by the warranty?  Or did you already know that?
4        MR. PADGETT:  Vague and ambiguous.  Assumes
5  facts not in evidence.  Calls for expert opinion and
6  legal conclusion.
7        THE WITNESS:  To be honest, I don't remember
8  at this time.  But I do remember them telling me that
9  there was something that I would have to pay for.
10 BY MR. AZAR:
11 Q  Okay.  And so they gave you a ride home.  What
12 happened next with regard to your vehicle?
13 A  I guess they took it in for service.  And I don't
14 think they actually inspected the vehicle because they
15 called me and told me that they didn't know what was
16 wrong with the vehicle.
17    But in order to find out, they needed to drop the
18 transmission.  And that was going to cost me in itself
19 $1,000.
20    So at that point, assuming it was the clutch, I
21 would have to pay for the parts and repair.
22 Q  Okay.  And what did you tell them?
23 A  No.
24 Q  Okay.  So what happened next?
25 A  Well, what I told them is let me think about this

Page 126

1  because it just didn't seem right to be charging me for
2  something that they didn't even know what the issue was.
3         So at that point I obviously didn't want to give
4  them more money since the whole reason I purchased this
5  car was to avoid issues like this.  And I just felt
6  wronged.
7         So that is when I started researching how much a
8  repair would cost outside of the dealership, how much
9  was the part was.  At the time come to find out I
10 couldn't even find a part aftermarket or anywhere else
11 outside of the dealership.
12        And that is when I started seeing all of these
13 issues about previous lawsuits with the clutch and the
14 different years and ongoing issues of people talking
15 about similar issues that I was experiencing.
16        So, you know, and then after that they pointed me
17 to -- I guess there is like a federal site for wrongs
18 and complaints about cars that hinted that this is a
19 known issue that they knew about.
20        So at that point that is when I am like okay,
21 well, it all makes sense now.  It is not -- you know, it
22 is not so much something I was doing.  But it is just
23 something that came from the factory.
24    Q   Okay.  Do you remember what you looked at?  Any
25 particular websites you looked at?

Page 127

1    A   Offhand, no.  I think I might have you provided
2   that in answers, though.  Off hand, no.  It was a slew
3   of different websites.
4        And that is when they called me back.  And I
5   explained to them that, if I honestly felt that I was
6   the cause of the issue, I would have no problem paying
7   for this.  But from what I can tell, this seems to be a
8   defect.
9        And it is not so much the issue -- I won't have
10  so much grief to repair, let's say, this defect.  But
11  the issue I had is, if this is, in fact, a defective
12  part, if I'm paying you to replace it, you are just
13  going to replace it with the same defective part.
14   Q   Okay.  Why did you think that?
15   A   Because I wasn't the only person experiencing
16  this issue.  And I actually ran into a couple of people
17  saying that, when they did pay for the replacement, they
18  eventually had to come back and repair it again.
19        And that is one thing, you know, I wanted to
20  avoid.  You know, I'm not exactly made of money here.
21   Q   When you say you ran into a couple of people --
22   A   Well, in my research through the websites.
23   Q   Got you.
24   A   So I explained that to the dealership.  And they
25  were, like, I don't know what you are talking about.

Page 130

1  after that -- eventually, I told -- I don't know if I
2  called them or they called me, about -- asking about the
3  repair.  And I was just so -- I mean, pissed, I guess
4  you could say.
5         I told them, you know what, don't even touch my
6  car.  I'm going to send a tow truck.  And the guy is
7  like.  Okay.  And I want to say the next day in the
8  morning the service -- I want to say service manager is
9  the one that called me.
10        And he said -- he kind of offered -- they are
11 like, look, we want to -- want you to fix it here.  How
12 about I offer you some discounts on labor and parts?
13        And I was, like, okay, what are you offering?
14 And he offered me like around parts and labor like
15 $1,200, which at that point it seemed reasonable, seeing
16 as that was the -- one of the price points I was hearing
17 that it was probably going to cost me if I fixed it
18 outside.
19        So I figured at that point it would be better to
20 fix it with them because then, if it does go bad again,
21 which at that point I just made the assumption that it
22 was, at least I could say I got it fixed at the
23 dealership.  And they can't use the fact that I fixed it
24 somewhere else as a cop out.
25    Q   So stepping back for a second, a lot of the

Page 131

1  research you were looking at, I think you said, some of
2  it related to a lawsuit?
3     A   I found web sites relating to previous lawsuits.
4     Q   Did you know anything about -- or strike that.
5         Do you remember anything about that lawsuit?
6             MR. PADGETT:  Objection.  Mischaracterizes
7  prior testimony.  Vague and ambiguous.
8             THE WITNESS:  I didn't know anything at the
9  time, no.
10 BY MR. AZAR:
11    Q   So what about that lawsuit or information about
12 that lawsuit or stories about that lawsuit that you were
13 looking at made you say, oh, this is the same problem I
14 am having here?
15            MR. PADGETT:  Objection.  Vague and
16 ambiguous.  Mischaracterizes prior testimony.
17            THE WITNESS:  I believe the lawsuit for that
18 website was for previous models of the Dodge Dart.  And
19 it was specific to the clutch.  And it depicted some of
20 the symptoms that I was experiencing.
21 BY MR. AZAR:
22    Q   And so sometime after that you received a letter
23 from FCA; correct?
24    A   What letter?
25    Q   Well, actually, before we get there, let me hand

Page 141

1    Q   Did you personally watch the repairs that were
2  done or any part of them?
3    A   No.
4    Q   Did you look at any parts that were repaired or
5  replaced?
6    A   No.
7    Q   Did the mechanics at the dealership show you any
8  parts?
9    A   No.
10   Q   Did you ask that the mechanics keep any of the
11 parts they took out of your clutch?
12   A   No.
13   Q   Other than this document, Exhibit I, that we are
14 looking at, are you aware of any other documents,
15 records, photographs, notes that describe the repair
16 that was done to your vehicle in January, 2016?
17   A   No.
18   Q   Do you recall anything else about this repair
19 other than what is reflected in this record and what you
20 have already told me?
21            MR. PADGETT:  Vague and ambiguous.
22            THE WITNESS:  I can't recollect anything
23 else.
24 BY MR. AZAR:
25   Q   Did you consult with your cousin, Enrique

Page 176

1  would not know if they would be represented in this
2  case.
3  BY MR. AZAR:
4     Q   Now, as we talked about earlier, there is no
5  record of your having your clutch master cylinder
6  replaced; correct?
7            MR. PADGETT:  Objection.  Expert opinion.
8            THE WITNESS:  As per the receipt, correct.
9  BY MR. AZAR:
10    Q   Are you seeking to represent people who did have
11 their clutch master cylinder replaced?
12           MR. PADGETT:  Objection.  Calls for a legal
13 conclusion.  Calls for a legal analysis.  Calls for an
14 expert opinion.
15           Go ahead.
16           THE WITNESS:  Again, not being a lawyer,
17 whatever is covered by this clutch defect.
18 BY MR. AZAR:
19    Q   Tell me about how you retained Capstone Law as
20 your lawyers.  When did that happen?
21    A   When the initial issue occurred with the clutch
22 failure, when I was doing research on parts on the
23 clutch, clutch part.
24           MR. PADGETT:  And just to admonish the
25 witness, you should answer the question to the extent

Page 177

1   you can without revealing the content of any
2   communications you had with your attorneys.
3   BY MR. AZAR:
4   Q   And I'm not asking what you said to them or what
5   they said to you.  I want to get the basics of when you
6   hired them, how you found them, those details.  So you
7   had the repair in January of, 2016.
8        How soon after that did you retain them?
9   A   I want to say two, three months after.
10  Q   And so walk me through the steps that led to your
11  retaining them?
12          MR. PADGETT:  And I am just going to object
13  to the extent it calls for attorney-client privileged
14  information.
15          And, of course, you can answer the question
16  without revealing that information.
17          THE WITNESS:  I initially contacted them
18  because they had had another case regarding the similar
19  issue, but they had informed me that it did not cover
20  the year model of my car.
21  BY MR. AZAR:
22  Q   Okay.  So when was the first time you ever talked
23  to anyone at Capstone Law?
24  A   My first time probably would have been around
25  January when I e-mailed them.

Page 178

```
 1     Q    January of 2016?
 2     A    Uh-huh.
 3     Q    So the same month you had your clutch repair?
 4     A    Correct.
 5     Q    And you e-mailed them.  Where did you get their
 6   e-mail address?
 7     A    Just during the initial search of the clutch.  It
 8   is one of the pages that popped up.
 9     Q    Okay.  So did you see -- did you read their
10   e-mail address off of some sort of legal pleading?  Or
11   did you find a website that gave you their e-mail
12   address?
13     A    It was a website regarding a previous lawsuit.
14   They had like a contact us type of thing.
15     Q    Do you remember what the issue was in that
16   website?
17             MR. PADGETT:  Vague and ambiguous.
18             THE WITNESS:  Same issue.
19   BY MR. AZAR:
20     Q    Do you remember what the website was?
21     A    No.
22     Q    Do you remember -- well, tell me as much as you
23   can remember about that website.
24     A    I want to say it was something in regards to the
25   faulty clutch in the Dodge Darts 2013 and previous
```