UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS VICTORINO and ADAM TAVITIAN, individually, and on behalf of other members of the general public similarly situated,<br><br>               Plaintiffs,<br><br>v.<br><br>FCA US LLC,  a Delaware limited liability company, ,<br><br>               Defendant. | Case No.:  16cv1617-GPC(JLB)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE**<br><br>**[Dkt. No. 116.]** |

Before the Court is Defendant's motion for sanctions for spoliation of evidence. (Dkt. No. 116.)  Plaintiff filed an opposition and Defendant filed a reply.  (Dkt. Nos. 124, 129.)   Based on the reasoning below, the Court GRANTS in part and DENIES in part Defendant's motion for sanctions for spoliation of evidence by Plaintiffs.

I.      **Background**

Plaintiffs Carlos Victorino ("Victorino") and Adam Tavitian ("Tavitian") (collectively "Defendants") filed a purported first amended class action complaint based on defects in the 2013-2016 Dodge Dart vehicles equipped with a Fiat C635 manual

1

transmission that cause their vehicles' clutches to fail and stick to the floor. (Dkt. No. 104, FAC ¶¶ 1, 2.) Defendant FCA US LLC ("Defendant") designs, manufactures, markets, distributes, services, repairs, sells and leases passenger vehicles, including Plaintiffs' vehicles. (Id. ¶ 52.) Plaintiffs assert that the clutch pedal defect causes their vehicles to stall, fail to accelerate, and results in "premature failure of the transmission's components, including, but not limited to, the clutch master cylinder and reservoir hose, clutch slave cylinder and release bearing, clutch disc, pressure plate, and flywheel." (Id. ¶ 2.) Plaintiffs' causes of action are based on Defendant's failure to disclose and/or intentionally concealing the defect in the Clutch System. (Id. ¶¶ 99, 117.)

In its motion, FCA seeks sanctions for spoliation of evidence and requests that the Court (1) dismiss Plaintiff Tavitian's individual claims or order that an adverse inference instruction be given at trial on his claims, (2) order that an adverse inference instruction be given at trial on the claims made by Plaintiff Victorino, (3) find that Plaintiffs are not typical of, and are inadequate representatives of, the putative class, and (4) sanction Plaintiffs' counsel as the Court deems appropriate. (Dkt. No. 116.)

On June 24, 2016, Plaintiffs filed their original complaint alleging that there was a defect in the clutch system involving a design flaw in the clutch master cylinder with collateral damage to the slave cylinder and related components. (Dkt. No. 1, Compl. ¶¶ 3-4.) On June 14, 2017, in addressing the scope of the transmission defect alleged in the complaint on Defendant's motion for summary judgment, the Court concluded that while Plaintiffs asserted a defect with the clutch master cylinder causing collateral damage to the slave cylinder, Plaintiffs' allegation concerning an independent defect in the slave cylinder due to the use of a plastic base clip was not alleged in the complaint, and granted Plaintiffs leave to file a first amended complaint. (Dkt. No. 91.) On June 19, 2017, Plaintiffs filed a FAC and alleged a defect in the clutch master cylinder and a separate, independent defect in the slave cylinder. (Dkt. No. 104.)

### A.  Facts as to Spoliation of Evidence by Tavitian[1]

Tavitian purchased a 2013 manual-transmission Dodge Dart in late November 2012.  (Dkt. No. 74, Ps' Response to SUMF, No. 20.)  He testified that within six months of purchasing the car, he noted something off about the clutch.  (Dkt. No. 55-2, Wallace Decl., Ex. K, Tavitian Depo. at 103:6-14.)  Every once in a while when he put his foot on the clutch, "it would either feel like it was a heavy clutch or when I took my foot off it would take a second to catch up, like hit my foot on the way up . . . ."  (Id.)

In July 2014, when he was driving on the start of a steep incline on Interstate 5 called the "Grapevine", Tavitian's clutch stuck to the floor and he was forced to pull it up after each shift for over 50 miles.  (Id., Ex. L at 72.)  On July 7, 2014, Tavitian took his vehicle to Rydell Chrysler Dodge Jeep Ram.  (Id.; Dkt. No. 50-13, D'Aunoy Decl., Ex. J at 3-6.)  The service advisor described Tavitian's complaints as follows:

> CUSTOMER STATES CLUTCH KEEPS GETTING STUCK
> WILL NOT ALLOW CUSTOMER TO SHIFT BETWEEN GEARS AT TIMES
> CK AND ADVISE VEHICLE HAS MAX CARE COVERAGE
> CLUTCH MASTER CYLINDER LEAKING

(Dkt. No. 55-2, Wallace Decl., Ex. M at 78.)  On July 8, 2014, the same service advisor wrote,

> CUSTOMER STATES CLUTCH KEEPS GETTING STUCK.
> SOP MASTER CYLINDER IS IN
> MASTER CYLINDER LEAKING
> REPLACED CLUTCH MASTER CYLINDER

(Dkt. No. 55-2, Wallace Decl., Ex. HH at 122.)  Tavitian paid $298.33 for the repair.  (Id.)  Tavitian applied for reimbursement of the $298.33 pursuant to the January 2016 voluntary customer service action which provided an extended warranty for free repairs

---

[11] Some of the facts are taken from the Court's order on Defendant's summary judgment motion and order on Defendant's motion for leave to file a third party complaint.  (Dkt. Nos. 91, 133.)

of the clutch master cylinder. (Dkt. No. 50-14, D'Aunoy Decl., Ex. L at 2.) His request for reimbursement was denied.

On March 4, 2015, the check engine light was on and the car was jerking so Tavitian took his car to Van Nuys Chrysler Dodge Jeep Ram and the clutch pedal switch was replaced. (Dkt. No. 125-1, Wallace Decl. ¶ 6.) Over a year later, around July 9, 2016, his vehicle's clutch failed while driving to Palm Springs; it stuck to the floor and he wasn't able to pull it back up. (Dkt. No. 55-2, Wallace Decl., Ex. L at 72-73.) The car was towed to Glendale Dodge Chrysler Jeep indicating the issue as "clutch pedal stays on the floor and will not come (sic) back up." (Id. at 73; Dkt. No. 50-16, D'Aunoy Decl., Ex. M at 3-4.)

On July 11, 2016, two weeks after the complaint was filed, Plaintiffs' counsel emailed FCA's counsel about Tavitian's clutch failure and offered an inspection of the vehicle at the dealership. (Dkt. No. 116-4, Morgan Decl., Ex. B.) The email also stated, "[t]o the extent any parts are returned to FCA, please take notice that we intend to inspect them and ask that you preserve them." (Id.) On July 13, 2016, FCA's counsel informed Plaintiffs' counsel that FCA planned to have a representative present to observe the diagnosis and/or possible repairs of the vehicle. (Dkt. No. 124-1, Zohdy Decl., Ex. C at 20.)

On August 16, 2016[2], FCA's expert conducted an inspection of Tavititan's vehicle with FCA's counsel present. (Dkt. No. 116-2, Morgan Decl. ¶ 9; id., Ex. C at 2.; Dkt. No. 125-1, Wallace Decl. ¶ 10.) Because the complaint only alleged a defect in the clutch master cylinder, the inspection was limited to that part and did not focus on the clutch slave cylinder. (Dkt. No. 116-2, Morgan Decl. ¶ 9.) During the inspection,

---

[2] Morgan's Declaration states that he attended the inspection on August 6, 2016. However, other documents corroborate that the inspection took place on August 16, 2016. (Dkt. No. 116-5, Morgan Decl., Ex. C at 2.)

FCA's counsel informed Plaintiffs' counsel by phone and with a follow up email that in order to complete the inspection, the clutch master cylinder had to be replaced and FCA was willing to pay for the repairs for purposes of completing the inspection and without waiving any rights. (Dkt. No. 116-5, Morgan Decl., Ex. C at 2.)  In that email, Plaintiffs' counsel responded with "[w]e forgot to add during the call that we would request that FCA preserve any removed or replaced parts for purposes of discovery and inspection. (Id.)

Despite replacing the clutch master cylinder and the reservoir hose and after bleeding the clutch lines, the clutch pedal was still stuck down.  (Dkt. No. 50-16, D'Aunoy Decl., Ex. M at 3-4.)  Upon further investigation and removing the transmission, the dealership found the throw-out bearing coming apart and leaking, and after removing the clutch disc for inspection, it found the clutch disc was worn out and there were signs of overheating.  (Dkt. No. 116-2, Morgan Decl., Ex. D.)  The dealer recommended replacing the "clutch assembly and throw out bearing" for $1717.12.  (Id.) Tavitian declined repairs at the dealership.  (Id.)  Once it was determined that the clutch master cylinder was not at issue, FCA concluded its inspection.  (Id., Morgan Decl. ¶ 9.)

Instead, on October 3, 2016, Tavitian brought his vehicle to J&E Auto Services, Inc. ("J&E") where Tavitian repeated what the dealership told him, that it needed a new pressure plate and throw-out bearing (slave cylinder).  (Dkt. No. 124-1, Zohdy Decl., Ex. F, Tavitian Depo. at 254:22-255:255; Dkt. No. 125-1, Wallace Decl. ¶ 13.)  J&E installed a new clutch set and new slave cylinder for $950.70.  (Dkt. No. 55-2, Wallace Decl., Ex. N at 2.)

Emad Salama, the owner of J&E and a mechanic, testified that he could see brake fluid dripping from the transmission, which implicated the clutch slave cylinder.  (Dkt. No. 125-1, Wallace Decl. ¶ 14.)  He pulled out the transmission, replaced the clutch, and added brake fluid.  (Id. ¶ 15.)  Over the course of two weeks, J&E replaced multiple parts

and also had to bleed the air out of the clutch system.  (Id. ¶ 16.)  A replacement part, an OEM slave cylinder, was purchased by J&E from Glendale Chrysler Dodge Jeep which he later reported to them as defective.  (Id. ¶ 17.)  When J&E sought to purchase another one, the dealership refused to sell another slave cylinder claiming that Tavitian's vehicle had been "red-flagged."  (Id. ¶ 18.)  J&E was unable to resolve the clutch issue and refunded Tavitian his money.  (Id. ¶ 19.)

On June 20, 2017, Salama testified that he threw away Tavitian's slave cylinder, the clutch master cylinder and a connecting hose a few days after the work was performed because Tavitian did not ask for them and neither did his attorneys.  (Dkt. No. 116-7, Morgan Decl., Ex. E, Salama Depo. at 40:25-42:6; id., Ex. A, Tavitian Depo. at 264:20-265:9.)

Despite the attempted repairs, Tavitian continued to experience symptoms of a stuck clutch pedal and his car was towed to Russell Westbrook Chrysler Dodge Jeep Ram on January 24, 2017.  (Dkt. No. 55-2, Wallace Decl., Ex. O.)  The technician reconnected the hydraulic clutch master hose that was disconnected and bled the hydraulic clutch system.  (Id.)

On February 20, 2017, Tavitian's car was towed back to Russell Westbrook Chrysler Dodge Jeep Ram because the clutch was "non-operational."  (Dkt. No. 125-1, Wallace Decl. ¶ 22.)  On February 24, 2017, Plaintiffs' counsel informed FCA's counsel, by mail and email, that Tavitian's vehicle was "exhibiting loss of clutch pressure" and underdoing diagnostics at Russell Westbrook and asked whether FCA would provide notice of its intent to inspect the vehicle and also requested it preserve any replaced parts.  (Dkt. No. 124-1, Zohdy Decl., Ex. L at 66-67.)  On March, 1, 2017, FCA's counsel wrote that the dealership reported that Tavitian's vehicle had a loose hose that needs to be reconnected so no parts were replaced.  (Id. at 63.)  Since the claims in the complaint was not about a loose hose, FCA was not present for the "repair."  (Id.)

On March 15, 2017, Russell Westbrook completed repairs and the "clutch pressure hose", a "union-clutch tube" and a "clip-clutch tube" were replaced on March 15, 2017. (Dkt. No. 125-1, Wallace Decl. ¶ 25.) The $315.88 Tavitian had previously paid for the January 2017 repair was credited to this repair. (Dkt. No. 125-1, Wallace Decl., Ex. I.)

## B.  Facts as to Spoliation of Evidence by Victorino

Victorino purchased a 2014 manual-transmission Dodge Dart on or about March 22, 2014. (Dkt. No. 74, Ps' Response to SUMF, No. 1.) Victorino testified that since the first day he owned the vehicle, it would "stall out" nearly every day. (Dkt. No. 55-2, Wallace Decl., Ex. H, Victorino Depo. at 89:24-90:3.) In the beginning, he thought it was just him getting used to the new vehicle. (Id.) But it kept continuing and after the vehicle would stall, it would not turn back on. (Id.) In January 2016, the car became "undriveable." (Id. at 96:11-15.) Victorino "noticed that the gears were not properly 'catching' when attempting to shift." (Dkt. No. 74, Ps' Response to SUMF, No. 4.) "The vehicle was bogging down and failing to accelerate as a result" and "while driving on the freeway to the dealership, he was only able to reach approximately 50 or 60 mph in 4th gear." (Dkt. No. 55-2, Wallace Decl., Ex. J, Ps' Suppl. Response to Interrog. No. 7 at 41.) On or about January 12, 2016, Victorino took his vehicle to San Diego Chrysler Dodge Jeep Ram for service. (Dkt. No. 74, Ps' Response to SMUF, No. 5.)

The dealership initially told Victorino that it did not know what was wrong with the vehicle but they needed to drop the transmission at a cost of $1,000 in order to figure it out. (Dkt. No. 116-9, Morgan Decl., Ex. G, Victorino Depo. at 125:11-21.) Victorino initially told them he needed to think about it and he started researching how much a repair and parts would cost outside the dealership. (Id. at 125:22-126:11.) During his research, he noticed there were lawsuits about the clutch and ongoing issues with drivers experiencing the same problems. (Id. at 126:7-23.) Then he realized he did not cause the issue but that it was from the factory. (Id.) The dealership later called him back and

Victorino explained what he had researched and the dealership said it did not know what he was talking about but then offered to fix the problem with a discount for a charge of $1,200. (Id. at 129:4-130:18.) Victorino agreed to have the dealership repair his vehicle since his research revealed the price to fix it elsewhere was similar and figured it would be better for the dealership to repair it in case the problem continued. (Id. at 14-24.) The service advisor noted "advise clutch is shot" and replaced the clutch assembly, flywheel, and slave cylinder which he stated were overheated and warped. (Dkt. No. 91, MSJ order at 3:12-23.) The flywheel was replaced at no charge and the remaining repairs totaled $1,165.31. (Dkt. No. 55-2, Wallace Decl., Ex. I at 46.) The clutch master cylinder was not replaced or repaired. (Dkt. No. 74, Ps' Response to SUMF, Nos. 10, 14.) Victorino never asked the dealership to retain any components that were removed from his vehicle. (Dkt. No. 116-9, Morgan Decl., Ex. G, Victorino Depo. at 36:9-37:8; 141:10-12.) In January 2016, Victorino saw his counsel's contact information on a website regarding another lawsuit concerning a faulty clutch in the Dodge Darts and emailed counsel for the first time. (Id. at 177:24-178:25.) Victorino retained his counsel two or three months later. (Id. at 177:4-9.)

## II.  Discussion

District courts may impose sanctions under their inherent power to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. In re Napster, Inc. Copyright Litig., 462 F. Supp. 2d 1060, 1066 (N.D. Cal. 2006) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991)). "Spoliation is the 'destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in pending or future litigation.'" Kearney v. Foley & Lardner, LLP, 590 F.3d 638, 649 (9th Cir. 2009) (citation omitted); see also Silvestri v. Gen. Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001) ("Spoliation refers to the destruction or material alteration

of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.")

Courts have imposed sanctions on parties for the spoliation of evidence by either instructing the jury that it may draw an adverse inference to the party responsible for destroying the evidence or excluding witness testimony proffered by the party responsible for destroying the evidence and based on the destroyed evidence, or dismissing the claim of the party responsible for destroying the evidence. In re Napster, 462 F. Supp. 2d at 1066 (citations omitted). "The sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999) (internal citations and quotation marks omitted). To decide which specific spoliation sanction to impose, courts generally consider three factors: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party." Reinsdorf v. Skechers U.S.A., Inc., 296 F.R.D. 604, 626 (2013) (quoting Apple, Inc. v. Samsung Elecs. Co., Ltd., 888 F. Supp. 2d 976, 992 (N.D. Cal. 2012) (internal quotation marks omitted)).

Every party has a duty to preserve relevant evidence it knows or should know is "relevant to a claim or defense of any party or that may lead to the discovery of relevant evidence." Compass Bank v. Morris Cerullo World Evangelism, 104 F. Supp. 3d 1040, 1051 (S.D. Cal. 2015); In re Napster, 462 F. Supp. 2d at 1067. "The duty to preserve arises not only during litigation, but also extends to the period before litigation when a party should reasonably know that evidence may be relevant to anticipated litigation."

Id. (citations omitted).  The duty to preserve arises as soon as a potential claim is identified.  In re Napster, 462 F. Supp. 2d at 1067.

### A.  Dismissal

Defendant seeks dismissal of Tavitian's claims for spoliation of evidence, or in the alternative, that an adverse inference instruction be given at trial on his claims. Defendant argues that Tavitian allowed his alleged defective clutch components, including the original slave cylinder, to be disposed of by J&E during the pending litigation.  Plaintiffs oppose arguing that the disposal of defective parts was reasonable because FCA and its agents had already inspected the vehicles and identified the parts as defective.

Dismissal is appropriate when "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings" because "courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice."  Leon v. IDX Sys., Corp., 464 F.3d 951, 958 (9th Cir. 2006) (quoting Anheuser-Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337, 348 (9th Cir. 1995)).   In dismissing a case as a sanction, the court must consider "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions."  Id.  The Court need not make explicit findings on each factor but a finding of "willfulness, fault, or bad faith" is necessary before dismissal is proper.  Id.  Dismissal as a sanction is warranted if the spoliation of relevant evidence is due to willfulness or bad faith.  Leon, 464 F.3d at 958.  The court must also consider "less severe alternatives" to dismissal.  Id.; John B. Hull, Inc. v. Waterbury Petroleum Prods., 845 F.2d 1172, 1176 (2d Cir. 1988) (since dismissal is a "drastic remedy," it "should be imposed only in extreme circumstances, usually after

16cv1617-GPC(JLB)

consideration of alternative, less drastic sanctions."). A party's destruction of evidence is willful if the party has "some notice that the documents were potentially relevant to the litigation before they were destroyed." Id. at 959 (citing United States v. Kitsap Physicians Serv., 314 F.3d 995, 1001 (9th Cir. 2002)).

In Leon, the Ninth Circuit affirmed the dismissal of the case for the plaintiff's spoliation of evidence. Leon, 464 F.3d at 961. The plaintiff, Leon, was hired as a director of medical informatics at the defendant's corporation. Id. at 955. A year after he was hired, Leon began complaining about mismanagement claiming there were irregularities in the financing and reporting of a federally-funded project. Id. After he was placed on unpaid leave, on April 25, 2003, the defendant filed a declaratory action seeking to establish that it could terminate Leon's employment without violating anti-retaliation provisions of three federal statutes. Id. A month later, on May 20, 2003, Leon filed his own action for retaliation claiming he was fired for his whistle-blowing activities. Id. Prior to Leon's lawsuit, Defendant's attorneys sought the return of a company laptop issued to the plaintiff. Id. at 956. Leon's attorney requested that he keep the laptop during the duration of an audit of a project. Id. In response, defense counsel stated Leon could keep the laptop solely for the purpose of responding to the auditors but cautioned that he should take care to preserve all data and that Leon should "ensure no data on the laptop is lost or corrupted so as to avoid any possible despoliation of evidence." Id. Once the laptop was returned, Defendant's expert discovered that "all data in the hard drive's unallocated space had been intentionally wiped" and more than 2,200 files had been deleted. Id. Leon admitted that he deleted entire directories of personal files after he was placed on leave by IDX in April 2003 and that the week before he returned the computer to IDX, he wrote a program to "wipe" any deleted files from the unallocated space in the hard drive. Id. He claimed that his deletion of relevant evidence was negligence because he only meant to wipe out personal information. Id. The district

court held an evidentiary hearing and concluded that the plaintiff had a duty to preserve the data on the laptop, the defendant was severely prejudiced, and Leon acted in bad faith and was willful. Id. at 956-57. The district court explained that he had no authority to unilaterally decide what was relevant because personal material could be relevant to Leon's claims. Id. The Ninth Circuit agreed with the district court concluding that dismissal was appropriate because other sanctions such as excluding evidence would be futile since relevant evidence had been destroyed, and a jury presumption would be ineffective. Id. at 957.

In another case, the Second Circuit held that dismissal sanction was not warranted and remanded the case for the district court to consider an alternative, less drastic sanction. West, 167 F.3d at 781. The plaintiff, West, a mechanic, was tasked by a customer, who brought in two tires manufactured by The Good Year Tire & Rubber Company, to find rims to fit the tires, mount the tires on the rims and put the wheel on his truck. Id. at 777. West had two used rims he purchased at a junkyard with diameters of 16.5 inches. Id. He did not determine the diameter of the two tires assuming both were 16.5 inches, when in fact, the information on the tires stated the diameter was 16 inches and warned that it should only be mounted on 16 inch rims. Id. at 778. West mounted the first 16 inch tires onto the 16.5 inch rims without a problem. Id. However, the second tire/rim combination could not hold air. Id. West added air to the second tire using his hand-held air nozzle that was connected to an air compressor. Id. While he added air, he never checked the inflation pressure of the tire and then the tired exploded, injuring the plaintiff. Id. The plaintiff filed a lawsuit against the tire and rim manufacturers. Id. The first tire, the exemplar wheel, was still fully inflated. Id. Ten months later, the plaintiff retained another counsel that specialized in tire explosion cases, and the exemplar wheel was sent to them. Id. Plaintiff's new counsel took photos of the exemplar wheel, and then had it deflated because he was afraid that the tire might

explode and cause serious injury.  Id.  Plaintiff's counsel did not notify the manufacturers before he deflated it.  Id.  A few month later, the plaintiff filed suit alleging negligence. Id.  During discovery, an inspection of West's shop, specifically an inspection of the tire mounting machine and air compressor, was scheduled; however, one month before the inspection, with no notice to the defendants, the plaintiff sold the tire changing machine and air compressor.  Id.  While the items were located, they had been left outside and their condition had deteriorated.  Id.  The district court granted dismissal based on spoliation of evidence.  The Second Circuit vacated the district court's dismissal concluding that dismissal was not the only adequate sanction to vindicate the purpose of the sanction.  The court remanded the case to allow the district court to fashion an appropriate but less severe sanction.  Id. at 781.   The court provided examples that the trial court could consider as alternative sanctions such as  "(1) instruct the jury to presume that the exemplar tire was overinflated; (2) instruct the jury to presume that the tire mounting machine and air compressor malfunctioned; and (3) preclude Mrs. West from offering evidence on these issues. We have previously endorsed use of these alternative sanctions, and in this case, conclude that they will suffice to protect the defendants."  Id.

Here, the original complaint alleging a defect in the clutch master cylinder with collateral damage to the slave cylinder was filed on June 24, 2016.  In response to Defendant's motion for summary judgment, Plaintiffs asserted that an independent defect in the slave cylinder was alleged in the original complaint.  Therefore, based on Plaintiffs' belief that the slave cylinder, itself, was defective, Tavitian had a duty to preserve the alleged defective clutch components, including the slave cylinder, that J&E replaced.  Moreover, Tavitian knew he was involved in litigation as a plaintiff representative in a class action concerning his vehicle's clutch system, and knew or should have known that FCA conducted an inspection of his clutch parts in August 2016.

Therefore, Tavitian knew or should have known he had a duty to preserve any parts that were repaired and replaced in his vehicle especially in the midst of litigation. Furthermore, Tavitian should have known of his duty in light of the fact that during this time period, Plaintiffs' counsel requested, on more than one occasion, that FCA preserve any parts that were returned to FCA. (<u>See</u> Dkt. No. 116-4, Morgan Decl., Ex. B; <u>id.</u>, Ex. C.)

### 1.     Willfulness, Fault or Bad Faith

Defendant argues that the Tavitian's spoliation is egregious because he simply needed to ask J&E to keep all clutch parts removed from his vehicle but Tavitian cannot explain why he failed to make the request. Therefore, he made a conscious and voluntary decision to allow evidence to be destroyed. Since he was aware that the parts were relevant to the litigation, he acted willfully and in bad faith. Plaintiffs do not directly address whether his spoliation was willful or done in bad faith but argues that it was reasonable for him to believe that the parts were not necessary for future examination or as evidence since FCA had already conducted its inspection of his car in August 2016.

Unlike the facts in <u>Leon</u>, where dismissal was granted as a sanction for spoliation, there is no indication that Tavitian's failure to request J&E to retain the parts it replaced was in bad faith or meant to hinder the litigation. Tavitian testified that he does not know why he did not tell J&E to preserve any removed parts and unlike the plaintiff in <u>Leon</u>, Tavitian was not specifically directed to preserve the clutch parts that were removed from his vehicle. Tavitian's conduct is similar to the plaintiff in <u>West</u> who was not directed to preserve the tire mounting machine and air compressor and there was no finding of bad faith and where the Second Circuit concluded that dismissal was not an adequate sanction. <u>See</u> <u>West</u>, 167 F.3d at 780. In this case, it appears Tavitian's failure to ask J&E to preserve his clutch parts was due to negligence, and not bad faith.

### 2.     Prejudice

FCA argues that the prejudice against it is great because it is deprived of an opportunity to test and inspect the alleged defective component parts alleged in the FAC. The prejudice is significant to its defenses because vehicle components wear and tear for different reasons that have nothing to do with a defect. FCA cannot directly prove that the original slave cylinder installed in Tavitian's vehicle was not defective. The spoliation precludes FCA from defending itself from the ultimate liability question in the case and its ability to oppose class certification.

Plaintiffs argue that FCA is not prejudiced because it already inspected Tavitian's vehicle in July/August 2016.[3] At that visit, the dealer replaced the clutch master cylinder and the reservoir hose but after bleeding the clutch lines, the clutch pedal was still stuck down. (Dkt. No. 50-16, D'Aunoy Decl., Ex. M at 3-4.) After removing the transmission, it found the throw out bearing coming apart and leaking, and after removing the clutch disc for inspection, it found the clutch worn out and there were signs of overheating. (Id.) Plaintiffs assert that because FCA had already inspected the vehicle and had possession of Tavitian's vehicle for a month, and identified the parts as defective, it was reasonable that Tavitian did not ask J&E to preserve the removed parts from his vehicle.

The prejudice inquiry "looks to whether the [spoliating party's] actions impaired [the affected party's] ability to go to trial or threatened to interfere with the rightful decision of the case." Leon, 464 F.3d at 959 (quoting United States ex rel. Wiltec Guam, Inc. v. Kahaluu Const. Co., 857 F.2d 600, 604 (9th Cir.1988) (citation omitted)).

Here, FCA is prejudiced without the ability to inspect the slave cylinder especially in light of the fact the alleged defect in the slave cylinder has recently been asserted in the

---

[3]Plaintiffs allege that FCA had an entire month to inspect Tavitian's vehicle; however, FCA explains that Tavitian agreed to have his car remain at the dealership until FCA's representative could come out to inspect the vehicle which did not occur until August 16, 2016. The inspection lasted less than one day. (Dkt. No. 129 at 8.)

FAC; however, the prejudice is mitigated by the fact that FCA inspected or visually viewed the alleged defective slave cylinder in August 2016. At the time of inspection, while FCA was aware of the allegation that the slave cylinder was collaterally damaged due to an alleged defect in the master clutch cylinder, FCA did not know that an independent defect in the slave cylinder was being asserted. Therefore, FCA did not inspect the slave cylinder as thoroughly as it could have or offered to pay for the replacement of the slave cylinder. Despites its prior inspection, prejudice still exists because FCA did not have an opportunity to fully inspect the slave cylinder for the alleged defect, a defect based on the use of a plastic base clip, asserted in the FAC.

The same argument concerning prejudice, that the Defendant had an opportunity to inspect the spoliated evidence before it was destroyed, was made by the plaintiff in <u>Leon</u>. Leon argued that the defendant was not prejudiced because it had sole possession of his laptop for three weeks starting September 11, 2002. The district court noted, however, that the relevant information to its defense would have been created after October 2002, when the relationship between the two parties grew contentious. <u>Leon v. IDX Sys. Corp.</u>, No. C03-1158P, 2004 WL 5571412, at *4 (W.D. Wash. Sept. 30, 2004). The Ninth Circuit did not find the district court's findings clearly erroneous. <u>Leon</u>, 464 F.3d at 960.

Similar to <u>Leon</u>, Defendant was not aware that the clutch slave cylinder, itself, was at issue when it conducted its inspection on August 16, 2016; however, the similarity ends there where the defendant in <u>Leon</u> had no reason to inspect the plaintiff's laptop because the contentious relationship did not begin until after the laptop was returned to him. In this case, FCA knew, based on allegations in the original complaint, that there was a claim that the clutch slave cylinder was collaterally damaged by the defect in the master clutch cylinder. At the inspection, after the clutch master cylinder and reservoir hose were replaced and the clutch lines were bled, the transmission was removed and it was discovered that the throw out bearing was coming apart and leaking and after

16cv1617-GPC(JLB)

removing the clutch disc, it found the clutch was worn and there were signs of overheating. (Dkt. No. 116-6, Morgan Decl., Ex. D at 3.) The dealer recommended clutch assembly and throw out bearing to be replaced. (Id.) During the process of this inspection, FCA's expert was able to view the slave cylinder and related parts even though it was not aware that the slave cylinder, itself, was at issue in the case. To that extent, the prejudice is mitigated.

### 3. Less Drastic Sanctions

Here, based on the record before the Court, the dismissal of Tavitian's claims is a drastic measure considering that prejudice was mitigated when FCA inspected Tavitian's clutch system even though it did not know the clutch slave cylinder, independently, was at issue in the case, and Defendant has not shown that Tavitian acted in bad faith by failing to ask J&E to preserve the clutch component parts removed from his vehicle. The Court concludes that another less drastic sanction, an adverse inference instruction, for Tavitian's spoliation of evidence is more appropriate in this case.

### B. Adverse Inference

Alternatively, Defendant seeks an adverse inference jury instruction for Tavitian's failure to request that his removed parts, including the slave cylinder, be kept by J&E. Defendant also seeks an adverse inference instruction as to Victorino's failure to retain parts removed from his vehicle during a repair by the dealership.

The Ninth Circuit has approved the use of adverse inferences as a sanction for spoliation of evidence but has not provided a standard for determining when such sanctions are warranted. Apple, Inc. v. Samsung Elecs. Co., Ltd., 888 F. Supp. 2d 976, 989 (N.D. Cal. 2012). An adverse inference is an instruction to the trier of fact that evidence made unavailable by a party was unfavorable to that party. Nursing Home Pension Fund v. Oracle Corp., 254 F.R.D. 559, 563 (N.D. Cal. 2008). District courts in California have adopted the Second Circuit's three-part test which provides,

(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

Id. at 889-90 (citing Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002)).  A spoliation sanction must be determined on a case-by-case basis and should be commensurate to the spoliating party's motive or degree of fault in destroying the evidence.  Apple, Inc., 888 F. Supp. 2d at 992-93.

### 1.    Duty to Preserve

As discussed above, "[a] litigant is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or the subject of a pending discovery request." Wm. T. Thompson Co. v. General Nutrition Corp., 593 F. Supp. 1443, 1455 (C.D. Cal. 1984); In re Napster, 462 F. Supp. 2d at 1067 ("As soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action."). The duty to preserve documents attaches "when a party should have known that the evidence may be relevant to future litigation." In re Napster, 462 F. Supp. 2d at 1068 (quoting Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)). "The future litigation must be "probable," which has been held to mean "more than a possibility." Id. (citation omitted); Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc., 264 F.R.D. 517, 527 (N.D. Cal. 2009) (duty to preserve does not arise until a potential claim is identified or future litigation is probable).

As to Tavitian, as discussed above, because a complaint had already been filed, Tavitian had a duty to preserve evidence related to the claims in this case including the slave cylinder removed from his vehicle by J&E.  Tavitian knew or should have known

that any parts taken from Tavitian's vehicle during the inspection should have been preserved. The Court concludes that Tavitian had an obligation to preserve the removed parts from his car by J&E in October 2016, four months after the complaint was filed.

Defendant argues that Victorino was already anticipating litigation when he allowed the allegedly defective clutch components to be discarded by the dealership. On January 12, 2016, Victorino brought his vehicle into the dealership. The credit card payment for the invoice is dated January 14, 2016. (Dkt. No. 55-2, Wallace Decl., Ex. I at 37.) He testified that his first contact with Capstone Law was in January 2016 when he emailed them. (Dkt. No. 116-9, Morgan Decl., Ex. G, Victorino Depo. at 177:17-25.) He did not retain his counsel until two to three months later. (Id. at 177:8-9.) It is not clear whether he first contacted counsel before or after his repairs at the dealership. It is also not evident that litigation was "probable" in Victorino's mind when he first contacted his counsel in January 2016. Therefore, the Court concludes that Victorino did not have a duty to preserve the clutch component parts taken from his vehicle when the dealership repaired his vehicle in January 2016. Because Victorino had no duty to preserve his clutch component parts when his vehicle got repaired, he cannot be subject to sanctions for spoliation of evidence.

### 2.    Culpable State of Mind

The culpable state of mind factor is met by demonstrating that the evidence was destroyed "knowingly, even if without intent to [breach a duty to preserve it], or negligently." Residential Funding Corp., 306 F.3d at 108 (quoting Byrnie v. Town of Cromwell, 243 F.3d 93, 109 (2d Cir. 2001); Lewis v. Ryan, 261 F.R.D. 513, 521 (S.D. Cal. 2009) (citing Residential Funding Corp., 306 F.3d at 108) ("A culpable state of mind" includes negligence."); see also Uribe v. McKesson, 08cv1285-DMS(NLS), 2010 WL 4235863, at *3 (E.D. Cal. Oct. 21, 2010). The purpose of an adverse inference is not to impose any moral blame but to restore evidentiary balance and the risk should fall on

the party responsible for the loss.  <u>Residential Funding Corp.</u>, 305 F.3d at 108 (quoting <u>Turner v. Hudson Transit Lines, Inc.</u>, 142 F.R.D. 68, 75 (S.D.N.Y. 1991)).  A finding of "bad faith" is not a prerequisite.  <u>Glover v. BIC Corp.</u>, 6 F.3d 1318, 1329 (9th Cir. 1992).  A "party's destruction of evidence qualifies as willful spoliation if the party has 'some notice that the documents were potentially relevant to the litigation before they were destroyed.'"  <u>Leon</u>, 464 F.3d at 959 (citation omitted).

Here, as discussed above, Tavitian was aware or should have been aware there was litigation pending concerning a defect in his vehicle's clutch system, including the slave cylinder, and those parts would be relevant to the litigation, and his failure to preserve the parts when J&E conducted the repairs in his vehicle satisfies the culpable state of mind factor.

### 3.    Relevance

Here, the parties do not dispute that the disposed parts of Tavitian's slave cylinder and related components parts are relevant to his claims.

Defendant has shown that the three factors to support an adverse inference instruction has been met as to Tavitian's claims.  The Court next considers what type of adverse inference instruction should be imposed.

### 4.    Type of Adverse Inference Instruction

Adverse inference jury instructions come in varying degrees of harshness depending on the nature of the spoliation of evidence where "the more egregious the conduct, the more harsh the instruction."  <u>Apple Inc.</u>, 881 F. Supp. 2d at 1150 (citing <u>Pension Committee of Univ. of Montreal Pension Plan v. Banc of America Securities</u>, 685 F. Supp. 2d 456, 470 (S.D.N.Y. 2010), <u>abrogated on other grounds by</u> <u>Chin v. Port Auth. Of N.Y. & N.J.</u>, 685 F.3d 135, 162 (2d Cir. 2012)).

> In its most harsh form, when a spoliating party has acted willfully or in bad faith, the jury can be instructed that certain facts are deemed admitted and must be accepted as true. At the next level, when a spoliating party has acted

willfully or recklessly, a court may impose a mandatory presumption. Even a mandatory presumption, however, is considered to be rebuttable. The least harsh instruction *permits* (but does not require) a jury to *presume* that the lost evidence is both relevant and favorable to the innocent party. If it makes this presumption, the spoliating party's rebuttal evidence must then be considered by the jury, which must then decide whether to draw an adverse inference against the spoliating party.

Id. (quoting <u>Pension Committee of Univ. of Montreal Pension Plan</u>, 685 F. Supp. 2d at 470).

Here, as discussed above, Tavitian did not act in bad faith when he did not ask J&E to retain his replaced clutch parts that are the subject of this litigation. Therefore, the harshest sanction is not warranted, but instead the Court finds that the next level of sanctions, a mandatory presumption should be imposed based on the spoliation of relevant evidence by Tavitian. The Court finds that a mandatory presumption addresses the purpose of the spoliation sanction to deter future spoliation of evidence, places the risk on Tavitian for his failure to retain the relevant clutch component parts that are dispositive to determining liability in the case, and attempts to restore FCA to the same position it would have been in if the clutch parts had not been disposed. <u>See</u> <u>West</u>, 167 F.3d at 779.

### C. Timeliness

Plaintiffs contend that the Court should deny Defendant's motion for sanctions because it is untimely since FCA knew about the J&E repairs done in October 2016 since at least November 2016. However, Defendant did not file a motion concerning spoliation of this evidence until August 22, 2017 over 9 months later. Defendant argues that it did not know until June 20, 2017 when it deposed J&E's owner that he had thrown away the replaced parts because Tavitian did not ask that it be preserved. Therefore, FCA claims it timely filed its motion.

District courts have held that an unreasonable delay can render a spoliation motion untimely.  See Goodman v. Praxair Services, Inc., 632 F. Supp. 2d 494, 506-08 (D. Md. 2009) (spoliation motion "should be filed as soon as reasonably possible after discovery of the facts that underlie them motion."); Montoya v. Orange Cnty. Sheriff's Dep't., No. SAVC 11-1922 JGB(RNBx), 2013 WL 6705992, at *6 (C.D. Cal. Dec. 18, 2013) (citing Goodman, 632 F.Supp.2d 494 at 508).

FCA claims that unlike the notice FCA received in July 2016 when Tavitian brought his car in for repairs, FCA claims it was not informed of the October 2016 repairs and did not learn about the repair of Tavitian's vehicle by J&E until February 2017 during discovery.  (Dkt. No. 116-2, Morgan Decl. ¶ 10.)  In its reply brief, FCA claims it did not possess the necessary facts to support a spoliation motion until June 20, 2017 when it deposed J&E's owner and learned that he had thrown out the relevant evidence.  (Dkt. No. 129 at 4.)  Moreover, Tavitian was claiming, during his deposition on April 27, 2017, that no component parts had been removed and thrown out from his vehicle.  (Dkt. No. 116-3, Morgan Decl., Ex A, Tavitian Depo. at 43:13-44:8.)  On the other hand, Plaintiffs' counsel claims that on November 4, 2016, Plaintiffs' counsel emailed to FCA the photos of J&E invoices showing Tavitian purchased new clutch parts from a dealership but the parts turned out to be defective and when he tried to exchange them, the dealership refused saying that his warranty was void.  (Dkt. No. 124-1, Zohdy Decl., Ex. I at 48.)  FCA's counsel requested PDF copies of the invoices which were sent on November 8, 2016.  (Id. at 47.)

The photos of the invoices from the dealership only show a portion of the invoices with the date and time and no description of the parts ordered.  (Dkt.  No. 124-1, Zohdy Decl., Ex. I at 50-52.)  While Plaintiffs provided Defendant with a copy of the invoices in PDF form, it is not clear whether the full copy of the invoices in PDF form, attached as Exhibit H to Zohdy's declaration, were emailed to FCA's counsel.  (Id., Ex. H.)

Nonetheless, the invoices themselves do not provide notice that J&E repaired and replaced components of Tavitian's clutch, such as the slave cylinder. The invoices reveal that J&E attempted to return an OEM slave cylinder as defective. Moreover, FCA's counsel's response to the PDF copies of the invoices further demonstrate that FCA did not have notice that J&E had repaired and replaced certain clutch parts. (Dkt. No. 124-1, Zohdy Decl., Ex. I at 47.) FCA's counsel responded by inquiring about the facts behind why the dealership refused to exchange the defective parts that J&E purchased. The Court notes that the November 4, 2016 email referenced that Tavitian "purchased new clutch parts from a dealership to repair his vehicle as we discussed", (Dkt. No. 124-1, Zohdy Decl., Ex. I at 48); however, it only demonstrates that the vehicle was attempting to be repaired and that J&E was refused the new clutch parts. It does not reveal that J&E repaired and replaced the clutch parts. It would appear that the clutch parts were not repaired since the dealership refused to provide new ones.

The record demonstrates that FCA did not actually know that J&E disposed of the relevant clutch parts until Salama's deposition on June 20, 2017. Moreover, Tavitian testified, in April 2017, that no component parts had been removed from his vehicle. Plaintiffs' argument that the spoliation motion is not timely is not supported by the record.

### D. Typical and Adequate Class Representative

FCA further contends that if the Court finds that an adverse instruction is appropriate then it asks that the Court find that Tavitian is not a proper class representative. Plaintiff disagrees distinguishing the facts in the cases Defendant presents where the plaintiff disposed of the relevant evidence prior to any inspection.

To obtain certification, a plaintiff bears the burden of proving that the class meets all four requirements of Rule 23(a)--numerosity, commonality, typicality, and adequacy. Ellis v. Costco Wholesale Corp., 657 F.3d 970, 979-80 (9th Cir. 2011). As to adequacy,

Rule 23(a)(4) provides that class representatives must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In analyzing whether Rule 23(a)(4) has been met, the Court must ask two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" Evon v. Law Offices of Sidney Mickell, 688 F.3d 1015, 1031 (9th Cir. 2012) (quoting Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998)).

Under typicality, the Court must determine whether the claims or defenses of the representative parties are typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." Hanlon, 150 F.3d at 1020. "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992) (internal citation omitted). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Id.

"Several courts have held that "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." Hanon, 976 F.2d at 508. A motion for class certification should not be granted if "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." Id. (citation omitted). "Defendants need not show that these unique defenses will necessarily succeed, but rather that they will shape the focus of litigation in a way that may harm class members and ultimately risk the class'

chance of recovery." <u>Schaefer v. Overland Express Family of Funds</u>, 169 F.R.D. 124, 129 (S.D. Cal. 1996).

Considering the consequences of a finding of inadequacy and that Tavitian may be an atypical class representative, the Court defers ruling until fuller briefing by the parties when Plaintiffs file their motion for class certification. The Court notes that the cases cited by Defendant addressed the issue of adequacy concerning the spoliation of evidence on a motion for class certification. <u>See</u> <u>Falcon v. Philips Elec. N. Am. Corp.</u>, 304 Fed. App'x 896, 897 (2d Cir. 2008) (affirming denial of class certification); <u>Akaosugi v. Benihana Nat'l Corp.</u>, 282 F.R.D. 241, 257 (N.D. Cal. 2012) (addressing class representatives' inadequacy based on spoliation of evidence on motion for class certification). Therefore, the Court defers ruling on this issue until Plaintiffs file their motion for class certification.

## E. Attorney Sanctions

Defendant argues that Plaintiffs' counsel failed to adequately oversee Tavitian's discovery efforts and failed to advise him of the need to preserve evidence especially when these failures occurred during the same time frame when Plaintiffs' counsel was requesting FCA to preserve evidence. FCA asks the Court to exercise its broad discretion to fashion an appropriate sanction for Plaintiff's counsel. For example, the Court could sanction counsel in the form of an admonishment to avoid future violations of their basic duty to instruct their clients about preserving evidence. Plaintiffs assert that FCA's arguments are pure speculation and unsupported, and meant to invade the attorney-client privilege.

"Counsel bear responsibility for coordinating their clients' discovery production" and failure to do so may warrant sanctions. <u>Knickerbocker v. Corinthian Colleges</u>, 298 F.R.D. 670, 678 (W.D. Wash. 2014) (citing <u>Zubulake v. UBS Warburg LLC</u>, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("Counsel must take affirmative steps to monitor compliance

so that all sources of discoverable information are identified and searched."); <u>Qualcomm Inc. v. Broadcom Corp.</u>, 05CV 1958-B (BLM), 2008 WL 66932 (S.D. Cal. Jan. 7, 2008) <u>vacated in part</u>, 05CV 1958-B (BLM), 2008 WL 638108 (S.D. Cal. Mar. 5, 2008) (sanctioning attorneys because they "did not conduct a reasonable inquiry into the adequacy of [their client's] document search and production and, accordingly, they are responsible, along with [their client] for the monumental discovery violation)).

Here, unlike the evidence to support attorney sanctions in <u>Knickerbocker</u>, in this case, Defendant provides no evidence[4], besides an inference, to support its allegation that Plaintiffs' counsel failed to adequately oversee Tavitian's discovery efforts. <u>See Knickerbocker</u>, 298 F.R.D. at 681 (court found by clear and convincing evidence, that the defendants and its counsel's "lackluster search for documents, failure to implement a litigation hold, deletion of evidence, refusal to cooperate with Plaintiffs in the discovery process (particularly as evidenced by its withholding of information regarding both the backup tapes and its interpretation of the parties' Stipulated Order), reliance on a recklessly false declaration, shifting litigation positions, and inaccurate representations to the court constitute bad faith or conduct tantamount to bad faith."). Accordingly, in the absence of any evidence concerning Plaintiffs' counsel's conduct during discovery, the Court declines to impose sanctions on Plaintiffs' counsel.

---

[4] In the reply, Defendant claims that Plaintiffs' counsel are relying on facts that are "absolutely false." (Dkt. No. 129 at 2.) FCA asserts that Victorino had received, prior to his repairs in January 2016, notice from FCA a Customer Service Action x62 and expected his repairs to be at no cost. However, Victorino admitted at his deposition that he did not receive the notice of the CSA x62 until after his repairs were completed. The evidence cited to by Defendant does not support the assertion that Plaintiffs' counsel is relying on false facts. Plaintiffs' counsel's declaration only states that Victorino received CSA x62 in January 2016 and that since he was experiencing the exact problems listed in the CSA x62 he expected his repairs to be at no cost. (Dkt. No. 124-1, Zohdy Decl. 32, 33.) Victorino testified that he received the CSA x62 after his repairs, contacted the dealership about the CSA x62 who told him that since the letter did not specify a part number it could not honor it and advised that he submit a claim. (Dkt. No. 129-3, Ex. B, Victorino Depo. at 138:5-22.) There is no indication that Plaintiffs' counsel is relying on false facts.

### III.    Conclusion

Based on the above, the Court GRANTS in part and DENIES in part Defendant's motion for sanctions for spoliation of evidence.  Specifically, the Court GRANTS Defendant's motion for sanctions as to Tavitian in the form of an adverse inference instruction.  The Court DENIES Defendant's motion for sanctions as to Victorino.  The hearing set for October 13, 2017 shall be **<u>vacated</u>**.

IT IS SO ORDERED.

Dated:  October 11, 2017

Hon. Gonzalo P. Curiel
United States District Judge

16cv1617-GPC(JLB)